## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| DELORISE DANCY, | ) | |
|              Plaintiff, | ) | |
| v. | ) | No.    10 C 1940 |
| | ) | Judge Blanche M. Manning |
| | ) | |
| MICHAEL ASTRUE, Commissioner of | ) | |
| the Social Security Administration, | ) | |
|              Defendant. | ) | |

## MEMORANDUM AND ORDER

Plaintiff Delorise Dancy filed suit after a final decision by the Commissioner of Social Security that she was not entitled to disability insurance benefits. Dancy filed her claim on February 26, 2006, claiming disability as of February 26, 2003. The claim was denied initially and on reconsideration. Dancy filed a timely written request for a hearing, which was held on May 5, 2008. The administrative law judge (ALJ) concluded in a written opinion issued on October 28, 2008, that Dancy was not disabled. Dancy's appeal of this decision was denied and Dancy subsequently filed the instant lawsuit seeking review of the ALJ's decision. The plaintiff has moved for summary judgment or, in the alternative, remand for further proceedings. For the reasons stated below, the motion to remand [33-1] is granted.

A.    *Background Facts*

Dancy was born on April 26, 1955, and was 47 years old at the alleged onset date of her disability, April 28, 2003. Dancy has an associates' degree in applied science which, according to her lawyer, "was geared toward child care." R. 25. She worked from approximately 1989 to 1999 as a teacher/teaching assistant in various day care centers, and briefly as a homemaker for elderly clients. R. 206. Dancy testified that she stopped working in 2003[1] because of "problems . . . concentrating and I was having trouble off and on with my back and high blood pressure." R. 28. Dancy initially reported in her disability application that severe high blood pressure and glaucoma limited her ability to work. A few weeks prior to her hearing, Dancy was involved in a car accident and sustained a back injury, which she claimed also prevented her from working. At the hearing, Dancy testified that she also was unable to work due to sleep apnea and gastrointestinal disease ("GERD").

In addition to Dancy's testimony, a medical expert, Dr. Irving Zitman, and a vocational expert, Michelle Peters, testified. The ALJ concluded that Dancy was not disabled. Specifically,

---

[1]Although Dancy testified that she stopped working in 2003, it is not clear from the record what work she did from 1999 to 2003.

the ALJ analyzed Dancy's claim pursuant to the five-step process described below and concluded that: (1) Dancy was not engaged in substantial gainful activity; (2) Dancy had the following severe impairments: bilateral carpal tunnel syndrome, near morbid obesity, glaucoma, and hypertension; (3) Dancy did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart B; (4) Dancy had the RFC to perform light work, and (5) given Dancy's age, education, work experience and RFC, there exist jobs in the national economy that she could perform, including information clerk, and packaging, inspection and/or sorter with only gross manipulations required.

Delorise Dancy. Dancy testified that she stopped working and generally watches TV or reads magazines at home. She occasionally helps her grandchildren, who live near her, with their homework or they sometimes spend the night with her. Dancy stated that based on advice from her doctor, she occasionally tries to walk about a block. Her sister also lives nearby and Dancy walks to her sister's house and visits with her or goes out to breakfast with her once or twice a week. Dancy testified that she cooks a little bit for herself and sometimes drives, but cannot make her bed alone because of problems with her hands. Dancy stated that she can button her blouse, tie a shoe, pick a coin up from a table, and write her name, but has trouble washing dishes, sweeping the floor and climbing stairs. According to Dancy, her hands sometimes hurt a good deal because of her carpal tunnel syndrome and so she takes over the counter Tylenol and wears a special glove. Dancy also stated that her doctor prescribed her 600 milligram Ibuprofen tablets. R. 48.

With respect to her back, Dancy said that sometimes it hurts so much that she cannot stand and has to sit down. Dancy testified that she can stand for about 10 minutes, R. 42, and sit for about an hour. *Id*. She tries to ride an exercise bike every night, which helps the back pain, and she occasionally walks on a treadmill. *Id*. at 38, 50. She went to the emergency room once in 2007 for chest pain, but was not seen after having waited most of the day. *Id*. at 43. She went to the hospital again several days later and stayed for several days. According to Dancy, her doctor told her that she may have had a slight heart attack, but cardiac testing on Dancy shows normal results. Dancy also stated that she sometimes stops breathing when she sleeps, was diagnosed with sleep apnea and was told to try to wear a C-PAP mask to help her sleep. She did not use it consistently as it was not comfortable. Dancy stated that she sometimes is sleepy during the day if she has not slept well.

Dr. Irving Zitman. The medical expert, Dr. Zitman, reviewed Dancy's medical records and questioned Dancy at the hearing. Zitman first noted that Dancy was close to morbidly obese. He then opined that Dancy's glaucoma was being well-controlled with eyedrops and has not affected her visual acuity. Specifically, he noted that the medical records indicate that Dancy's eyesight is normal at approximately 20/25 and that there is no evidence that the glaucoma has impaired her visual field. Zitman further noted the repeated references to GERD and stated that the eyedrops Dancy was using for the glaucoma could lead to stomach upset or exacerbate the GERD. Nevertheless, he opined that GERD was a "very common thing," R. 64, "something that she can treat with antacids," *id*., and is "not a limiting factor." *Id.* In addition, Zitman believed that any chest pains Dancy experienced were related to her GERD given the negative stress test results.

Zitman also stated that while an MRI indicated that Dancy had degenerative lumbosacral disease, she did not have disc herniation. He further noted some disc bulging and arthritis, and stated that it appeared that the car accident may have aggravated a previously existing degeneration. While opining that this aggravation and the resulting pain was not likely to last for 12 months, Zitman indicated that one could not tell whether it was a severe impairment without further thorough examination. R. 77. In addition, he stated that Dancy had mild hypertension that was being controlled with beta blockers and diuretics. With respect to the carpal tunnel syndrome, Zitman indicated that the main issue was numbness and the fact that the pain started at night, making it difficult for Dancy to sleep. Zitman believed that Dancy's hand strength was unaffected and that lifting 10 to 20 pounds should not be a problem. However, he stated that the condition would likely interfere with the "fine use" of Dancy's hands and repetitive movements. R. 71. With respect to the sleep apnea, he agreed that a polysomnagram signaled that Dancy had a sleep disorder, which he characterized as mild. R. 82. He also noted that the records did not indicate that the apnea affected her brain function or that she had daytime somnolence, which might interfere with her ability to perform work.

Dr. Bhargavi Nettem. Dr. Nettem is Dancy's treating physician. He submitted to the ALJ a Physical Capacities Evaluation in which he opined that Dancy's work capacity was sedentary and that she could not climb, stoop, operate foot controls, or reach above her shoulders. He also indicated that Dancy could use her hands for gross manipulations but not fine manipulations. He further noted that the physical or functional limitations that would affect Dancy's employment were chronic low back pain and bilateral carpal tunnel syndrome and that, in his evaluation, he had taken into account the limitations imposed by Dancy's pain.

B.     *Standard for Establishing Disability and the Sequential Evaluation*

"Under the applicable disability analysis, a claimant will be found to be disabled if she shows the existence of a medically determinable physical or mental impairment that will last at least twelve months or result in death." *Skinner v. Astrue*, 478 F.3d 836 (7th Cir. 2007)(citing 42 U.S.C. § 1382c(a)(3)(A)-(B)). "The impairment is disabling if it renders the claimant unable to engage in substantial gainful activity." *Id.* (citations omitted). Further, the plaintiff's impairments must also prevent her from not only doing her previous work, but any other work existing in significant numbers in the economy. 42 U.S.C. § 1382c(a)(3)(B). The plaintiff bears the ultimate burden of proof on disability. 20 C.F.R. § 416.912(a); *Meredith v. Bowen*, 833 F.2d 650, 655 (7th Cir. 1987).

To determine whether the claimant has a disability in accordance with the Social Security Regulations, the Commissioner uses a five-step sequential analysis to determine whether the plaintiff: (1) is engaged in substantial gainful activity[2]; (2) has a severe impairment; (3) has a medically severe impairment that meets or equals an impairment in the Listing of Impairments in

---

[2]"Substantial work activity is work activity that involves doing significant physical or mental activities." 20 C.F.R. § 416.972(a). "Gainful work activity is work activity that you do for pay or profit. Work activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 416.972(b).

20 C.F.R. Pt. 404, Subpt. P. App. 1; (4) has a sufficient residual functional capacity (RFC)[3] to perform her past work; and (5) has a sufficient RFC to perform other work in the national economy. *See* 20 C.F.R. § 404.1520(a)(disability insurance benefits claims).

The ALJ considers each step and if it can be determined that the plaintiff is either disabled or not disabled at a specific step, the Commission will make its determination and will not go on to the next step. *Id.* Specifically, "an affirmative answer at any step leads either to the next step, or, at steps three and five, to a finding that the claimant is disabled." *Patterson v. Barnhart*, 428 F. Supp. 2d 869, 872 (E.D. Wis. 2006). "A negative answer at any point, other than step three, ends the inquiry and leads to a determination that the claimant is not disabled." *Id*. Once the plaintiff reaches step five, the Commissioner has the burden of proving that there are jobs in the national economy that the plaintiff can perform. *Id*. (citation omitted).

Section 205 of the Social Security Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, are conclusive." 42 U.S.C. § 405(g). In reviewing the Commissioner's decision, the court may not decide the facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir.1985). Instead, its review is limited to determining whether the ALJ applied the correct legal standards in reaching a decision and whether substantial evidence in the record supports the findings. 42 U.S.C. § 405(g); *Eichstadt v. Astrue*, 534 F.3d 663, 665-66 (7th Cir. 2008).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The ALJ's decision must be affirmed if the findings and inferences reasonably drawn from the record are supported by substantial evidence, even though some evidence may support the claimant's argument. 42 U.S.C. § 405(g). Moreover, a credibility determination made by the ALJ will not be disturbed unless it is patently wrong. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). The ALJ's conclusions of law, however, are not entitled to such deference. If the ALJ committed an error of law, "reversal is required without regard to the volume of the evidence in support of the factual findings." *Imani v. Heckler*, 797 F.2d 508, 510 (7th Cir. 1986).

C.     *Analysis*

Dancy contends that the ALJ's decision must be reversed for several reasons. First, given the ALJ's duty to develop the record, it was error for the ALJ to decide the case without resolving the uncertainty as to the duration and severity of Dancy's back problems. Second, Dancy asserts that the ALJ's conclusion regarding Dancy's residual functional capacity is not supported by substantial evidence or by the medical evidence. Third, Dancy claims that the opinion of Dancy's treating doctor, Dr. Nettem, should have been accepted as he was best able to assess her condition as a whole, including her obesity. Because the court concludes that the first issue requires a remand to the Commission, it does not address Dancy's second and third

---

[3]RFC is an assessment of the claimant's ability to perform sustained work-related physical and mental activities in light of her impairments. SSR 96-8p.

arguments.

1. <u>Was it error for the ALJ to decide the case without resolving the uncertainty as to the duration and severity of Dancy's back problem</u>?

During his testimony regarding Dancy's back condition, the medical expert, Dr. Zitman, testified that "[i]n my practice as an internal medicine [doctor], when a patient came to me and said after six months after an injury of this sort, the pain hasn't gone away and it's not getting better, I would refer her to a specialist to have a very thorough examination to make sure that there isn't any permanent damage here, and that hasn't been done here. And I would say that before one can say that this is a severe impairment, chronic that has lasted 12 months, she needs a thorough examination." R. 76-77. He then went on to state that "I don't know that anybody can say on the basis of what's in this file what they've done up to date that this is a permanent or non treatable condition." *Id*. at 77.

Nevertheless, the ALJ concluded that the back pain (among other of the ailments) was non-severe. R. 13-14. The ALJ, in discussing Dancy's low back pain, writes that "the independent medical expert (ME) testified that the claimant's lumbosacral strain that occurred as a result of the accident would be a severe impairment, but it did not meet the durational twelve month requirement for a severe impairment."

However, the court's review of the record reflects that no evidence was presented as to whether the back injury meets the durational requirement. Specifically, Zitman stated that Dancy had been in a car accident six months prior to the hearing and that before the accident, the "file reflects non severe impairments." R. 88. However, the following exchange then occurred between Zitman and the ALJ:

> ALJ: After that date [the date of the accident], 11/20/07, which of the impairments would you consider medically severe?
>
> Zitman: Well, I think from all of the impairments that she's complaining of, muscular skeletal aches and pains, the low back pain is the most severe of all.
>
> ALJ: And so that would be the degenerative back disease.
>
> Zitman: The degenerative arthritis and perhaps some lumbo sacral strain that occurred during that [accident]. That's common to have happen.
>
> ALJ: Okay.
>
> Zitman: And I would say that that is a severe impairment.
>
> ALJ: *But we don't know*, there's *no durational evidence on that*.

R. 88 (emphasis added). Thus, although the ALJ indicated in her written decision that "[the low

back pain] did not meet the durational twelve month requirement for a severe impairment," R. 14, the exchange quoted above shows that the ALJ acknowledged that there was simply *no* evidence from which one could conclude whether it met the durational requirement or not. Given Zitman's statement that the lumbosacral strain that likely occurred during the accident would be a severe impairment, it was incumbent upon the ALJ to confirm whether such an impairment met the durational requirement.

The Commission asserts that "irrespective of what Dr. Zitman meant" by his statement that a more thorough examination would be required, "he made it before [making] a functional assessment that accounted for Dancy's condition persisting for at least 12 months." R. 90 ("I would think her standing and walking with the degree of pain that's assessed that she alleges and, which has been verified here would be four hours."). But the Commission's excerpt is incomplete. Indeed, just before making the statement that he believed that Dancy could stand and walk for four hours, Zitman states that "I think that standing at the present time *and that would not be for a 12-month period* but at the present time, to make the evaluation at the present time . . ." *Id.* (emphasis added). Thus, contrary to the Commission's assertion that Zitman's functional assessment accounted for Dancy's condition persisting for twelve months, Zitman expressly qualified his opinion by stating "that would not be for a 12-month period."

The Commission also asserts that if Dancy needed further development, she should have requested it and that "[i]t is not the ALJ's responsibility to adjust a counseled claimant's strategy." Response at 7, Dkt. #37. While it is true that Dancy bears the burden of producing medical evidence that supports her claim of disability, it is also true that the "ALJ has a duty to fully develop the record before drawing any conclusions." *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007). Here, despite being told by the medical expert that he would need additional information before he could ascertain whether Dancy's lower back pain resulted from an impairment that would have lasted for twelve months or more, the ALJ simply concluded that the impairment did not meet the durational requirement. The ALJ must provide a "logical bridge" from the evidence to the conclusion, *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 486 (7th Cir. 2007), but failed to do so here. Accordingly, Dancy's motion for remand [33-1] is granted. Because Dancy's other two challenges regarding the ALJ's conclusion as to Dancy's RFC and the credibility of the treating physician could be affected by the remand, the court need not address these issues now.

The decision of the Commissioner finding that Dancy was not disabled and therefore not entitled to receive disability insurance benefits is, pursuant to sentence four of 42 U.S.C. § 405(g), reversed and remanded back to the agency for rehearing and reconsideration of evidence.

**ENTER:**

**Date**: February 14, 2011

*Blanche M. Manning*
_____
**United States District Judge**